# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 24, 2012

## STATE OF TENNESSEE v. MARTIN DEAN GIBBS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3561      Mark J. Fishburn, Judge**

---

**No. M2011-00740-CCA-R3-CD - Filed June 27, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, Martin Dean Gibbs, of four counts of rape of a child, a Class A felony, and eight counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced him to concurrent sentences of twenty-five years for each rape of a child conviction and ten years for each aggravated sexual battery conviction for a total effective sentence of twenty-five years in confinement. On appeal, the appellant contends that (1) the trial court erred by allowing a social worker to testify about the victim's allegations pursuant to Tennessee Rule of Evidence 803(4), the medical diagnosis and treatment exception to the hearsay rule; (2) the trial court erred by allowing the victim's mother to testify about the victim's allegations as prior consistent statements; (3) the evidence is insufficient to support the convictions in counts 7 and 11; and (4) his convictions in counts 1 and 9, 2 and 10, and 3 and 11 violate protections against double jeopardy. The State concedes that the evidence is insufficient as to count 11. Based upon the record and the parties' briefs, we agree that the evidence is insufficient to support the appellant's rape of a child conviction in count 11. Therefore, that conviction is reversed, and the charge is dismissed. The appellant's remaining convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JEFFREY S. BIVINS, J., filed a concurring opinion.

Jeffrey A. DeVasher (on appeal), Melissa Harrison (at trial and on appeal), and J. Michael Engle (at trial), Nashville, Tennessee, for appellant, Martin Dean Gibbs.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Rob McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

In October 2009, the Davidson County Grand Jury indicted the appellant for four counts of rape of a child and eight counts of aggravated sexual battery.  According to the indictments, the rape of a child offenses occurred between July 1, 2007, and December 3, 2009, and the aggravated sexual battery offenses occurred between April 25, 2006, and December 3, 2009.  The victim of the offenses was the appellant's step-granddaughter, who was born on April 25, 2001.

The victim's stepfather, also the appellant's son, testified that he had been married to the victim's mother for nine years and had raised the victim as his own child since she was two or three weeks old.  He said that he had two sisters, that his family was very close, and that he spent a lot of time at his parents' house.  His wife and children also spent a lot of time there.  He sometimes left his children in his parents' care, and he trusted the appellant to be alone with his children.  The victim's stepfather said that the appellant and the victim were very close, that the appellant took care of the victim, and that the appellant's relationship with the victim was "probably closer than any of the other grandchildren."  The victim's mother also got along well with the appellant.  The victim's stepfather said his parents had a surveillance system in their home.  A camera was focused on the living room, and a television monitor was in the computer room, allowing a person sitting in the computer room to see what was happening in the living room.

The victim's stepfather testified that in November 2009, his mother spent some time in the hospital.  While she was gone, his children spent extra time at the appellant's home.  One night in late November 2009, the victim's younger brother said the victim and the appellant had been having sex.  The victim's stepfather said the victim "got really defensive" and accused her brother of lying.  The victim's stepfather said he was concerned because "if there was no truth to this, then it wouldn't have bothered her like it did, I could tell that she was holding something in."  The victim's mother and stepfather spoke privately with her.  At first, the victim denied anything inappropriate with the appellant.  However, the victim's mother tricked the victim by telling the victim that she was going to watch tape recordings of the video surveillance to find out what was going on.  The victim's stepfather said that the victim "broke down and started crying" and that he was "sure in my heart that something was going wrong."  He said that the victim told him about "things that definitely shouldn't have

-2-

been taking place" and that he telephoned his pastor and the police. He also spoke with the appellant about the victim's allegations. He said that the appellant "denied everything" and that the appellant wanted to speak with the victim's mother. At some point, the victim's stepfather stopped having any communication with the appellant.

On cross-examination, the victim's stepfather testified that the appellant was a good father. He acknowledged that the appellant had a hearing problem and had trouble hearing over the telephone. He also acknowledged that he and his wife were advised not to speak with the victim about her allegations but that they did so anyway. On redirect examination, the victim's stepfather testified that the victim sometimes wanted to talk with him about what had happened with the appellant. He explained, "I did not go into detail about the things that they told us not to talk about, but if my daughter comes to me and asks me questions about things that she needs to know, I'm going to talk to her about it."

The victim testified that she was nine years old and in the fourth grade. She had a younger sister and brother and called her stepfather's parents "granddad" and "nanny." The victim would go to her grandparents' home and spend time playing on the computer, watching television, and riding a four-wheeler. The State showed the victim an anatomical drawing of a young naked female, and she identified the breasts, buttocks, and genitalia. The victim referred to the buttocks as "bottom" and the genitalia as "stuff." The State also showed the victim an anatomical drawing of a naked adult male. Again, the victim identified the breasts, buttocks, and genitalia and referred to the buttocks as "bottom" and the genitalia as "stuff." She said that no one was supposed to touch a person's breasts, "bottom," or "stuff."

The victim testified that when she played on the appellant's computer, he "usually put his hands in my stuff." She said that she would sit on his lap in the computer room and that he would touch her "stuff" with his finger. She said he touched her skin and touched her over her clothes. The State asked, "And how was it that he was able to touch your stuff with his finger on your skin?" She said he unzipped her pants and "put his finger in." The State then asked, "And did [his] finger touch the inside or the outside?" The victim answered, "The inside." The State asked her, "And did it also touch the outside sometimes?" The victim answered, "Yes, ma'am." The appellant also touched the victim while she was lying on the couch in the computer room. The victim explained that the appellant sat in a chair, "scooted his chair to the couch," and touched her "stuff." The State asked, "And would he touch it on the inside or the outside or both?" The victim answered, "Both." She said the appellant touched her "[a] bunch" while she was sitting on his lap in the computer room. She said that she did not remember how many times he touched her while she was lying on the couch but that it occurred more than one time. The victim said that she saw a movie on the appellant's computer and that the movie showed "[p]eople licking other people's stuff." The

appellant was in the computer room with the victim during the movie. The victim said her grandmother usually was lying on the couch in the living room while the appellant was touching her in the computer room. The appellant could see the living room on the surveillance monitor and stopped touching the victim if he saw someone coming.

The victim also testified about incidents of abuse that occurred in her grandparents' bedroom. She said that the appellant "unzipped my pants and just started putting his finger in my stuff." She said that "[it] felt weird" and that her grandmother was lying on the couch in the living room. She said that in another incident, the appellant got out of the shower and touched her "stuff" on "[t]he inside." She said that in another incident in the bedroom, the appellant, who was wearing his housecoat, unzipped her pants and "put his stuff . . . on mine." She said that she was lying on the bed, that the appellant's "stuff" touched her inside, and that the appellant "made me put his hand on his stuff." The victim acknowledged that her hand was on the appellant's "stuff." The victim's grandmother was in the living room during the incident. The victim said she did not remember telling the prosecutor that the housecoat incident occurred while her grandmother was in the hospital. The victim said that the appellant also unzipped his pants while they were in the bedroom, that he put her hand on his "stuff," and that he moved her hand. The appellant put the victim's hand on his penis more than five times. Finally, the victim said that while her grandmother was in the hospital, the appellant "licked [the victim's] stuff" as she was lying on the bed.

The victim testified that the appellant also touched her while they were riding the four-wheeler. She said the appellant was sitting behind her, unzipped her pants, and "put his hands in." She said that she did not remember how many times the appellant touched her on the four-wheeler but that he touched her more than five times.

The victim testified that the appellant abused her while her family lived in Ashland City and after her family moved from Ashland City to Dickson. She said that she did not remember when the first or last incidents of abuse occurred but that the abuse stopped when she told her parents. The victim did not tell her parents earlier because she was scared.

On cross-examination, the victim acknowledged that before trial, she practiced what she was going to say with the prosecutor. She also acknowledged that she went over her testimony with her mother and that her mother helped her think of what to say. She said that she talked with her mother about the abuse more than ten times, that she did not tell her younger brother about the abuse, and that she did not know how he found out about it. She acknowledged that she spoke with a woman about the abuse and that she did not tell the woman that the appellant licked her "stuff," that he put his "stuff" on her "stuff," or that he made her touch his "stuff." She acknowledged that she also did not tell a nurse that the appellant licked her "stuff," that he put his "stuff" on her "stuff," or that he made her touch

-4-

his "stuff." She denied that the appellant rubbed her back or stomach and said that she did not remember telling someone the appellant touched her back and stomach while they were riding the four-wheeler. She said that while her grandmother was in the hospital, the appellant abused her in the computer room and the bedroom but not on the four-wheeler. She said she did not remember telling someone that her grandmother was in the hospital the first time the appellant abused her. She acknowledged that she remembered only one incident of abuse in the bedroom and one incident on the four-wheeler. However, she also said that she did not remember how many times the appellant abused her in the bedroom or on the four-wheeler. The defense asked the victim, "Now, when you say that your granddad touched you inside, do you mean inside your clothes?" The victim answered, "Yes."

On redirect examination, the victim testified that her mother told her to tell the truth. She acknowledged that she remembered two specific incidents of abuse that occurred in the appellant's bedroom: one occurred when the appellant got out of the shower and touched her "stuff," and the second occurred when the appellant made her touch his "stuff" with his hand. She acknowledged that the appellant also licked her "stuff" in the bedroom. She said she did not remember how many times the appellant abused her in the computer room, in the bedroom, or on the four-wheeler but that he abused her many times. The State asked the victim, "[Y]ou told us that your granddad touched you on the inside and on the outside of your stuff, . . . when you go to the bathroom and wipe yourself, . . . are you wiping the inside or the outside?" The victim answered, "The outside." She acknowledged that she loved the appellant.

The victim's mother testified that she and her husband had been married for eight and one-half years, that she had a good relationship with his parents, and that she trusted them with her children. The victim was very close to the appellant, and they were always together. The victim's mother said that she and her husband were overprotective of their children and that she home-schooled them "to keep them out of certain environments." The appellant's wife was in the hospital in early November 2009, and the victim's mother spent some days and one night with her. While the victim's mother was away, the victim and her siblings stayed with the appellant so that the victim's stepfather could work.

The victim's mother testified that one night in late November 2009, she was cooking dinner. Her husband was sitting at the kitchen table, and their children were playing on the floor. She stated that her son "said something about [the victim] and granddaddy having sex." She said the victim got very upset and "just started trying to defend herself as if she had been caught doing something." The victim's mother told the victim that she was going to watch a surveillance videotape from the appellant's home. The victim's mother said the victim started crying and disclosed that the appellant had been "touching her and different things." The victim's stepfather telephoned their pastor, who contacted Kim Stringfield. The

next day, the victim's stepfather informed his sister about the victim's allegations because his sister had a three-year-old daughter.

The victim's mother testified that at first, the victim said the appellant "had rubbed her leg and stomach and things." However, after the victim went to the Child Advocacy Center (CAC), her parents learned more. The victim's mother explained,

> There's been so many things. She's described him having his hands in her pants and having to pull his hands out. She's described him having the video camera on the living room and that's how he would see when we were coming in the computer room to know when to pull his hands out of her pants. Many times on the four-wheeler when she was driving, he would - he would touch her. And there's been times at a cabin, they have a cabin in the back of the woods that we go camp and hunt in, and there's been times there that she said she's explained oral things that's happened.

The victim did not tell her mother about the pornographic video. The victim's mother learned about the video from her husband, whose mother told him about it. The victim's mother said that she did not tell the victim what to say at trial, that she told the victim to tell the truth, and that she did not coach the victim.

The victim's mother testified that she learned the appellant wanted to speak with her and that she telephoned him on December 7, 2009. She recorded the call, and the State played the audiotape for the jury. During the call, the appellant said he thought he needed to protect the victim from "getting into any kind of trouble." He acknowledged that the pornographic video was on his computer, said that it was "too available" to the children, and said that it may have "damaged" the victim. He stated that he had learned from his mistake and that "nothing like that" would be on his computer again. The victim's mother asked the appellant, "Do you know the things that she's saying?" The appellant said that he had heard the victim or her brother claimed he had sex with the victim and that "I'm not really sure what she calls having sex." He said that he and the victim were close, that she liked to be next to him, and that he put his cold hands on her stomach one time "just to get a reaction." He said the victim "must have like it" because "every now and then" she asked him to rub her stomach. He said that the victim played "kissing games" on the computer and that she told him she dreamed they did "what [she] saw in the movie on the computer." He stated, "I knew then that I had problems."

The victim's mother testified that the appellant had never indicated previously that the victim was acting sexually inappropriate with him. On December 8, she and Detective Jeff Wiser made a "controlled" telephone call to the appellant in which the appellant admitted touching the victim inappropriately. The victim's mother said that during the call, the appellant said he "wanted to teach her that was between two adults and she was too young to be liking other boys." The victim's mother and Detective Wiser made a second controlled call to the appellant on December 9. She said that during the call, the appellant claimed the victim did not need counseling, needed to go to church, and "would eventually forget everything." She said the appellant also "tried to take everything back from the day before."

On cross-examination, the victim's mother acknowledged that prior to the victim's allegations, the victim had been writing notes about sex to her friends. The victim also had been lying on top of her siblings, rubbing their bodies, and kissing them during play. The victim's mother acknowledged that Kim Stringfield and a Department of Children's Services (DCS) employee told her not to talk with the victim about the victim's allegations. However, the victim began talking about the abuse on her own. The victim's mother also acknowledged that Detective Wiser did not participate in her call to the appellant on December 7. The detective was present during her calls to the appellant on December 8 and 9. The detective coached her on questions to ask the appellant and how to respond to the appellant's answers. During the December 8 telephone call, the appellant asked her if the call was being recorded. She said she did not remember telling him, "This is just between me and you."

Kim Stringfield, the Director of the CAC for the 23rd District, testified that she was a trained forensic interviewer and a member of the same church as the victim's parents. One night, Stringfield's pastor contacted her and asked her to visit the victim's home. Stringfield and the pastor met with the victim's parents, who were distraught. The victim's parents said the victim claimed her grandfather touched her inappropriately. After speaking with the victim's parents, Stringfield reported the victim's possible abuse to DCS. Stringfield told the victim's mother not to question the victim but to let the victim talk about the abuse if the victim wanted. She also told the victim's parents that the appellant should not have access to children until an investigation was complete. At some point, the victim went to the CAC for an interview. Stringfield was not present during the interview but reviewed the interviewer's report. Stringfield said the victim claimed the appellant touched her "'millions'" of times, which "would be an average eight-year-old's way of saying 'more than I can count.'" Stringfield also said that it would have been impossible for the victim to remember the details of every occurrence but that "[s]he was able to give locations, as well as people who were present in the house."

On cross-examination, Stringfield acknowledged that an interviewer was to refrain from asking "yes/no" questions during a forensic interview. She said Tiffany Rosson, who interviewed the victim, was a trained forensic interviewer and asked "some specific question[s] that [were] potentially closed-ended." Stringfield said that the victim occasionally answered a question with "yes" or "no" but that "the information she disclosed [was] rather detailed for an eight-year-old."

Lisa Dupree, a social worker for the Our Kids Center at Nashville General Hospital, testified that the center was a "forensic evaluation unit" for children making allegations of sexual abuse. She said that she met with the victim on December 2, 2009, and that the victim demonstrated a "limited age appropriate understanding of genital anatomy." Dupree said that the victim's mother accompanied the victim, and Dupree acknowledged that the victim's mother "provid[ed] information regarding genital itching or burning." Dupree said that when she questioned the victim, the victim "reported that sometimes it hurts to pee and poop." The victim did not report any other pain or complaints.

Dupree testified that the victim told her, "'My granddad, he puts his finger in my stuff.'" The victim said that it happened more than one time and that the abuse started when she was five to seven years old. Dupree said the victim also told her, "'My bottom, he put his hands down my pants and my underwear and he would be rubbing my bottom and sometimes it hurt right here." The victim pointed to the waistband of her pants. The victim told Dupree that the appellant also put his hands up her shirt and rubbed her stomach. Dupree asked the victim if the appellant did anything else, and the victim said no. Dupree asked the victim if the appellant made the victim touch him, and the victim said, "'He grabbed my hand and made me touch his stuff.'" Dupree again asked the victim if the appellant did anything else, and the victim again said no. Dupree provided the victim's information to the nurse practitioner, who performed a full physical examination of the victim. Dupree said that the purpose of the victim's interview was to obtain information necessary only for medical treatment and diagnosis and that the interview was not for investigative purposes. She said that children sometimes disclosed additional information after their interview.

On cross-examination Dupree said that "roughly a month" had passed between the appellant's last contact with the victim and the victim's examination. The victim did not report any penile/vaginal penetration or cunnilingus. On redirect examination, Dupree testified that she would not have asked the victim about those types of abuse because "we don't introduce information to children."

Hollie Gallion, a pediatric nurse practitioner with the Our Kids Center, testified as an expert in forensic pediatric examinations that she performed the victim's physical exam.

Prior to the exam, Gallion met with Lisa Dupree and obtained the victim's medical history. Gallion said that based on the report of "digital/genital contact penetration," she checked the victim's genital area carefully for signs of injury or infection. The victim's hymen was intact. Gallion said that a child victim's hymen was "almost always" intact after sexual abuse, even penile penetration, and that physical findings of sexual abuse were rare. The victim's examination was normal, and Gallion did not try to collect DNA because the victim's last contact with the appellant occurred three weeks to one month before the exam. On cross-examination, Gallion acknowledged that she found no evidence of sexual abuse.

Detective Jeff Wiser of the Metropolitan Nashville Police Department testified that in early December 2009, the police department received a referral from DCS about the victim's allegations. Detective Wiser spoke with the victim's mother. On December 8, the victim's mother met with Detective Wiser at the criminal justice center. She told him about her conversation with the appellant on December 7 and gave him an audiotape of the conversation. Then she and the detective made a controlled telephone call to the appellant. The State played an audio recording of the call for the jury. At first, the appellant denied touching the victim. He said that one time, he was sleeping in bed with the victim and awoke with her touching his penis. He said that he asked her what she was doing and that she "didn't really say anything." The appellant decided that the victim did not need to be sleeping with him, so he slept on the couch. The appellant said that he had never done anything but rub the victim's stomach and that there was nothing sexual between them. Later, the appellant said that the victim was very curious and that he had rubbed her stomach and buttocks. He acknowledged that he also rubbed her on the outside of her "stuff." He said that he never thought he was hurting the victim and that he thought he was helping her. The appellant maintained that he did not put his finger inside the victim.

Detective Wiser testified that the next day, he and the victim's mother made another controlled telephone call to the appellant. The call was audio-recorded, and the State played the recording for the jury. During the call, the appellant told the victim's mother that he lied the previous day about touching the victim. He said he lied because "I felt like that was what you wanted to hear" and because he did not want to put the victim through counseling. He said that the victim had put his hand on her crotch three or four times but that "I never went anywhere with that." He said that he never told anyone about the victim's inappropriate behavior because he did not want to get her in trouble and that he thought he could "help things out by saying that I did do some stuff."

Detective Wiser testified that at some point, the grand jury indicted the appellant for sexually abusing the victim, and a police officer arrested the appellant. Detective Wiser read Miranda warnings to the appellant and interviewed him. The State played the video-recorded interview for the jury. During the interview, the appellant said the following: The appellant

lied about touching the victim "to help" her. He said the victim had had "this problem" for a while, meaning she would "reach and grab" his penis over his clothes. He said she also would grab his hand and "put it like she was wanting me to touch her." One time when the appellant and the victim were on the four-wheeler, the victim wanted the appellant to touch her vagina. The appellant decided to touch the victim "to prove to her that it's not as good as she thinks it is." The appellant said that he touched the victim's vagina over her clothes and that he "did it kind of rough." One time when they were playing on the computer, the victim again wanted the appellant to touch her. The appellant said he rubbed the victim roughly because "the first time must not have worked." The appellant said that one night, he was lying in bed, and the victim was lying next to him, watching television. The appellant said he fell asleep and awoke to the victim "doing something" to him. The victim jumped out of bed and ran to the bathroom. The appellant thought the victim might have been touching his penis. Later, the victim came back into the bedroom and wanted the appellant to touch her. The appellant said he decided to "give it one more chance." The appellant said he rubbed the victim's vagina "real hard" over her underwear, making sure "she knew it wasn't pleasure." The victim jumped up again and ran to the bathroom, and the appellant thought "maybe I got my point across." The appellant denied intentionally putting his finger inside the victim and said he first rubbed the victim about eight months prior to the interview. The appellant said he thought his rubbing the victim's vagina was something he needed to do "to keep her from going any further maybe with somebody else." The appellant acknowledged that the victim saw an adult movie on his computer. The victim found the movie on the computer; the appellant did not show the movie to her. The appellant said that he used to have an addiction to pornography but that "I'm over all that now."

Detective Wiser testified that at the conclusion of the appellant's interview, the appellant wrote a letter of apology to the victim. Detective Wiser read the letter to the jury, stating, in part, as follows:

> You always seem to be very curious about what it is like to have sex, remember when I told you sex is for adults and kids shouldn't know about these things, well, that - that is the truth. I only touched you to let you know - know that it is not fun, and I think you know that - I think you know that [now]. If I hurt you in any way it is because I love you very much and I wanted you to know that I might - I might have to hurt you just to teach you. This is not fun and you should never ever try this again. I hope you will forgive me. I was only trying to help you. . . . Just keep in mind that I did wrong and not you. You're hurt because of it, please let God help you to forget by praying to

him.  I'm sorry, I want to tell you that the next time I see you. Remember I love you.

On cross-examination, Detective Wiser testified that he told the victim's mother she could lie to the appellant "for the purpose of obtaining the truth."  The detective acknowledged that he repeatedly asked the appellant during his interview if he put his finger inside the victim's vagina.  Detective Wiser also acknowledged that he never interviewed the victim and that the victim never used the word "vagina."

The State rested its case-in-chief and made the following election of offenses:  Count 1, aggravated sexual battery, the appellant touched the victim's genital area with his hand while she sat on his lap in the computer room; count 2, aggravated sexual battery, the appellant touched the victim's genital area with his hand while she was lying on the couch in the computer room; count 3, aggravated sexual battery, the appellant touched the victim's genital area with his hand while she rode with him on the four-wheeler; count 4, aggravated sexual battery, the appellant touched the victim's genital area with his hand in the bedroom; count 5, aggravated sexual battery, the appellant unzipped his pants and placed the victim's hand on his penis; count 6, aggravated sexual battery, the appellant put the victim's hand on his hand, placed it on his penis, and made her hand move; count 7, aggravated sexual battery, the appellant put his hand down the victim's pants, causing the waistband to hurt her waist, and rubbed her buttocks; count 8, aggravated sexual battery, the appellant touched the victim's genital area with his genitals on the bed in the bedroom; count 9, rape of a child, the appellant digitally penetrated the victim's genitals in the computer room while she sat on his lap; count 10, rape of a child, the appellant digitally penetrated the victim's genitals while she was on the couch in the computer room; count 11, rape of a child, the appellant digitally penetrated the victim's genitals on the four-wheeler; and count 12, rape of a child, the appellant performed cunnilingus on the victim.

Cristi Tayse, the appellant's daughter, testified for the appellant that she had a good childhood and that the appellant was a good father.  The appellant never sexually abused her.  On cross-examination, Tayse acknowledged that her brother, the victim's stepfather, told her about the victim's allegations.  She denied indicating to the victim's stepfather that she was not surprised.  She said she was surprised about the victim's claims.

Samantha Nickens, a cousin of the appellant's wife, testified that she spent a lot of time at the appellant's home when she was growing up.  She said that the appellant was like a second father to her and was "awesome."  Nickens said that she spent many nights at the appellant's home and that he never sexually abused her.

## II.  Analysis

A.  Victim's Statements to Social Worker

The appellant argues that the trial court erred by allowing Lisa Dupree to testify about the victim's allegations pursuant to Tennessee Rule of Evidence 803(4), the medical diagnosis and treatment exception to the hearsay rule.  He contends that the victim's statements to Dupree were not made for the purpose of medical diagnosis or treatment and, therefore, were inadmissible.  The State argues that the statements were admissible.  We agree with the State.

During Dupree's direct testimony, the State asked her to describe her conversations with the victim.  The defense objected, arguing that Dupree's testimony was not admissible under the medical diagnosis and treatment exception to the hearsay rule because the victim's examination occurred almost one month after the victim's last encounter with the appellant and because the victim never alleged vaginal/penile penetration, eliminating the need to test her for sexually transmitted diseases.  The trial court overruled the objection.

Our supreme court has stated that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record."  State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)).  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay.  See Tenn. R. Evid. 802.  The victim's statements to Dupree were hearsay.  Therefore, absent a relevant hearsay exception, the statements were inadmissible.  Rule 803(4), Tennessee Rules of Evidence, provides an exception to the hearsay rule for "[statements] made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The appellant contends that this case is similar to State v. McLoed, 937 S.W.2d 867, 872 (Tenn. 1996).  In McLoed, a pediatrician testified at trial that she examined the eight-year-old victim one month after the victim's allegations surfaced, that the victim claimed the defendant fondled her, and that the victim said the abuse was not painful. 937 S.W.2d at 873. The pediatrician also testified that the victim's examination was "for evaluative purposes; and because fondling was the alleged abuse, she did not expect to find any physical evidence."  Id.  The jury convicted the defendant of aggravated sexual battery.  Id. at 872.

On appeal, our supreme court held that the trial court committed error, albeit harmless error, by allowing the pediatrician to testify pursuant to Tennessee Rule of Evidence 803(4) because "[t]he nature of the abuse made it unlikely that a physical examination would uncover trauma or other evidence of sexual abuse." Id. at 873.

In our view, the facts in the present case are distinguishable from McLoed. According to Dupree, the victim's mother reported that the victim complained of genital itching and burning, and the victim told Dupree that "sometimes it hurts to pee and poop." Dupree also testified that the victim said the appellant "puts his finger in my stuff," indicating that the appellant digitally penetrated the victim and not just fondled her. Therefore, we conclude that the exception to the hearsay rule applies in this case and that trial court properly allowed Dupree to testify about the victim's statements.

### B. Victim's Statements to Mother

Next, the appellant contends that the trial court erred by allowing the victim's mother to testify about the victim's allegations as prior consistent statements because the defense did not impeach the victim's testimony to the extent that the victim needed rehabilitating. The State argues that the trial court properly allowed the victim's mother to testify about the victim's allegations. We agree with the State.

During the victim's mother's testimony, the State asked her about the victim's claims. The defense objected, and the trial court told the victim's mother, "Don't tell us anything that [the victim] said, but you can explain all the circumstances surrounding your discussions and how it came about and this kind of thing." The State requested a bench conference. During the conference, the State argued that the victim's mother could testify about what the victim told her because "the victim's already testified and been subject to cross examination; this is circumstances of her disclosure, and case law is extraordinarily clear on that point, it couldn't be clearer that she can testify to everything [the victim] said." The defense argued that the victim's mother's testimony was not admissible as prior consistent statements because "the child [has] not been challenged." The State countered, "I mean there's all kinds of prior inconsistent statements that were elicited by [defense counsel]." The trial court noted that the defense had elicited from the victim that she failed to tell a nurse about the cunnilingus and "various other things." The court ruled that the victim's mother could testify about the victim's allegations.

The appellant objected to the victim's mother's testimony on the basis that her testimony was hearsay. In State v. Benton, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988), this court explained as follows:

> [U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

See also Danny Ray Smith, No. M2009-02275-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 269, at *(Nashville, Apr. 13, 2011) (stating that prior consistent statements may be admissible to rebut the inference that the witness recently fabricated the testimony), perm. to appeal denied, (Tenn. 2011). However, prior consistent statements are not hearsay because they are not offered for the truth of the matter asserted. See State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995); State v. Joseph Shaw, Jr., No. W2009-02326-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 708, at **18-19 (Jackson, Aug. 27, 2010), perm. to appeal denied, (Tenn. 2011); State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 1023, at *17 (Nashville, Dec. 15, 2006); Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[9] (6th ed. 2011).

The appellant argues that the trial court erred by allowing the victim's mother to testify about the victim's allegations because he did not impeach the victim's testimony to the extent that it needed rehabilitating. We disagree. One of the first questions the defense asked the victim on cross-examination was as follows: "Now, before you came to court today, you practiced what you were going to say, didn't you?" The victim said yes and acknowledged that she practiced her testimony with the prosecutor. The defense asked the victim if she also practiced her testimony with her mother, and the victim said yes. The defense asked the victim if her mother helped her think of what to say, and the victim said yes.

The victim also acknowledged during cross-examination that she never told the nurse at the Our Kids Center that the appellant licked her "stuff," that he put his "stuff" on her "stuff," or that he made her touch his "stuff." At the conclusion of the victim's cross-examination, the defense again questioned the victim about her mother. Specifically, the following exchange occurred:

> Q. How many times has your mom talked to you about this?
>
> A. I don't remember.

Q. More than five times?

A. Yes, ma'am.

Q. [M]ore than ten times?

A. Yes, ma'am.

Q. Okay. And she's helped you to think of what to say, hasn't she?

A. Yes, ma'am.

Q. And did she tell you the right things to say?

A. Yes, ma'am.

In our view, the defense attacked the victim's credibility, implying that she had fabricated the allegations and was testifying as her mother had instructed. The State was able to rehabilitate the victim's credibility somewhat on redirect examination by asking her if her mother told her to tell the truth. Nevertheless, we conclude that the defense opened the door to the victim's mother's testimony regarding prior consistent statements made to her by the victim.

The appellant also contends that the trial court should have instructed the jury that it could not consider the evidence substantively. However, the appellant has waived the issue because he failed to request such an instruction. See Tenn. R. Evid. 105; Shaw, No. W2009-02326-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 708, at *19.

## C. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions for aggravated sexual battery in count 7 and rape of a child in count 11. The State argues that the evidence is sufficient to support the conviction in count 7 but acknowledges that the evidence is insufficient in count 11. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979);

Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As charged in the indictment, aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [and] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a).

In count 7, the State alleged that the appellant committed aggravated sexual battery by putting his hand down the victim's pants, causing the waistband to hurt her waist, and rubbed her buttocks. The appellant argues that the evidence is insufficient to support the conviction because the only evidence of the incident came from the testimony of Lisa Dupree, who improperly testified about the victim's statements pursuant to Tennessee Rule of Evidence 803(4). However, we have already concluded that the trial court did not err when it allowed Dupree to testify about the victim's statements pursuant to the medical diagnosis and treatment exception to the hearsay rule. The jury obviously accredited Dupree's testimony. Therefore, the evidence is sufficient to support the appellant's conviction in count 7.

In count 11, the State alleged that the appellant committed rape of a child by digitally penetrating the victim's genitals on the four-wheeler. The appellant argues, and the State concedes, that no evidence in the record supports the conviction. We have carefully reviewed the victim's testimony regarding the four-wheeler. The victim testified that when she and the appellant were riding the four-wheeler, the appellant "started touching my stuff." The State asked her, "And how was it that he was able to touch your stuff?" The victim said he unzipped her pants and "put his hands in." She said his hand "[s]tayed still." We agree with the appellant and the State that the victim's testimony is insufficient to show that the

-16-

appellant digitally penetrated the victim.[1]  Therefore, the appellant's conviction for rape of a child in count 11 must be reversed.

## D.  Double Jeopardy

Finally, the appellant contends that this court should reverse his convictions in counts 1, 2, and 3 because they were part of the same three criminal episodes used to convict him in counts 9, 10, and 11.  Thus, they violate his protections against double jeopardy.  The State contends that, aside from the conviction for count 11, the appellant's remaining convictions should stand because the victim described a distinct criminal episode for each count.  We agree with the State.

Under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, no person shall "be subject for the same offence to  be twice put in jeopardy of life or limb."  Similarly, article I, section 10 of the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb."  The Double Jeopardy Clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense.  See State v. Nigel Kavic Watkins, 362 S.W.3d 530, 2012 Tenn. LEXIS 154, at *24 (Nashville, Mar. 9, 2012).

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense."  State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996).  Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy.  See U.S. Const. amend. V; Tenn. Const. Art. I, § 10.  In determining whether offenses are multiplicitous, a court should consider the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

---

[1]We note that the victim testified that the appellant touched her more than five times on the four-wheeler and that the evidence is sufficient to support a conviction for the lesser-included offense of aggravated sexual battery in count 11.  However, the victim did not testify about any facts that would distinguish an aggravated sexual battery conviction in count 11 from the aggravated sexual battery conviction in count 3.  Therefore, dual convictions for aggravated sexual battery in counts 3 and 11 could not stand. See Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996).

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Phillips, 924 S.W.2d at 665 (footnotes omitted).

Turning to the instant case, the State alleged in count 1 that the appellant committed aggravated sexual battery by touching the victim's genital area with his hand while she sat on his lap in the computer room and alleged in count 9 that the appellant committed rape of a child by digitally penetrating the victim's genitals while she sat on his lap in the computer room. The victim testified that the appellant would put his hand in her pants and touch her "stuff" while she sat on his lap in the computer room. She said that he touched her skin and that he touched her over her clothes. The State asked her if the appellant's finger touched "the inside or the outside," and the victim answered, "The inside." The State also asked her, "And did it also touch the outside sometimes?" The victim's said yes and demonstrated on redirect examination that she understood the difference between the inside and the outside of her vagina. The victim's testimony established separate incidents of abuse sufficient to support dual convictions in counts 1 and 9.

The State alleged in count 2 that the appellant committed aggravated sexual battery by touching the victim's genital area with his hand while she was on the couch in the computer room and alleged in count 10 that the appellant committed rape of a child by digitally penetrating the victim's genitals while she was on the couch in the computer room. The victim testified that the appellant put his hand in her pants and touched her "stuff" while she was lying on the couch. She testified that the appellant put his hand in her pants numerous times and that he touched her skin. The State asked her, "And would he touch it on the inside or the outside or both?" The victim answered, "Both." She said she did not remember how many times the appellant abused her on the couch but that he abused her more than once. Again, we conclude that the victim's testimony established separate incidents of abuse sufficient to support dual convictions in counts 2 and 10.

Regarding the appellant's claim of multiplicity in counts 3 and 11, we have concluded that the evidence is insufficient to support the conviction in count 11. Therefore, this issue is moot.

## III.  Conclusion

Based upon the record, and the parties' briefs, we conclude that the evidence is insufficient to support the appellant's rape of a child conviction in count 11.  Therefore, that conviction is reversed, and the charge is dismissed.  The appellant's remaining convictions are affirmed.

_____
NORMA MCGEE OGLE, JUDGE